28 C.C.P.A.(Patents)

## McKAY et al. v. KELLOGG (NEW FOODS, Inc., Assignee).

### Patent Appeal No. 4473.

Court of Customs and Patent Appeals.

June 9, 1941.

Rehearing Denied July 3, 1941.

Toulmin & Toulmin, of Washington, D. C. (M. Concannon, of Chicago, Ill., E. L. Harding, of Battle Creek, Mich., and H. A. Toulmin and H. A. Toulmin, Jr., both of Washington, D. C., of counsel), for appellant.

Barnett & Truman, of Chicago, Ill. (Percival H. Truman and Sherman R. Barnett, both of Chicago, Ill., of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal in an interference proceeding from the decision of the Board of Appeals of the United States Patent Office affirming the decision of the Examiner of Interferences awarding priority of invention of the subject matter defined in the counts in issue—Nos. 1 and 2—to appellee.

The interference is between appellants' application, No. 120,498, filed January 14, 1937, and appellee's application, No. 127,-672, filed February 25, 1937.

The invention relates to a process for producing a puffed corn product, and is sufficiently set forth in the counts in issue which read:

"1. Process of producing a puffed corn product which comprises: cooking the corn in water, subjecting the same to mechanical pressure to alter the internal structure of the grain without reducing it to a flaked condition; drying the material to a water content suitable for explosive puffing; and thereafter explosively puffing the material.

"2. Process of producing a puffed corn product which comprises: cooking the corn in water, partially drying the material, subjecting the same to mechanical pressure to alter the internal structure of the grain without reducing it to a flaked condition, drying the material to a water content of about 12%; and thereafter explosively puffing the material."

The burden was upon appellee the junior party to establish priority of invention by a preponderance of the evidence.

It appears from the record that appellants' application has been assigned to the Kellogg Company of Battle Creek, Michigan, manufacturers of food products, and that of appellee John L. Kellogg, Jr. (deceased), who died prior to the declaration of the interference, to New Foods, Inc., Chicago, Illinois, also manufacturers of food products, and that John L. Kellogg, Jr., was the son of the witness John L. Kellogg, president of New Foods, Inc., and the grandson of W. K. Kellogg, president of the Kellogg Company.

John L. Kellogg will hereinafter be referred to as Kellogg, Sr., and John L. Kellogg, Jr., as Kellogg, Jr.

It was contended before the tribunals of the Patent Office, and it is contended here by counsel for appellants, that appellants

conceived the invention defined by the counts in issue, disclosed it to others, and reduced it to practice on June 19, 1936.

It appears from the record that on June 19, 1936, appellant McKay was a vice president, director, and general plant manager of the Kellogg Company; that appellant Penty was in charge of the experimental department of the Kellogg Company; and that appellants had occupied their respective positions for several years prior to that date.

It appears from appellants' preliminary statement, which is signed by appellant Penty and dated September 9, 1938, that appellant McKay had at that time left the employ of the Kellogg Company and had declined to sign and swear to appellants' preliminary statement in which it was alleged that appellants had "made the invention" involved in this interference on or about June 19, 1936, and successfully carried out the involved process on that date, and that they again successfully carried out the involved process "and successfully produced the product in issue on or about the 30th day of October, 1936."

In support of their contention that appellants conceived and reduced the invention to practice on June 19, 1936, counsel rely upon appellants' exhibits Nos. 1, 2, and 6, together with the testimony of appellant Penty and the witnesses Frederic W. Swartz (who at the time of the taking of his testimony was a foreman in the plant of the Kellogg Company and who in June 1936 was employed in the experimental department of that company) and Lynn E. Rochester (an employee of the Kellogg Company, who during the year 1936 was employed in the experimental department of that company).

It appears from the testimony of appellant Penty and the witness Rochester that appellants' exhibits Nos. 1, 2, and 6 were written by the witness Rochester and signed by appellant Penty.

Appellants' exhibit No. 1 is dated June 18, 1936, and, so far as pertinent, reads:

"White Corn Puffs—2% salt

(A) Cooked 100 pounds of No. 4 grits with 1 gallon of water which was the condensation from the cooker after heating 1 hour, and 2% salt. This was cooked 1 hour 5 minutes at 18 pound pressure. Separated in grinder, and rolled hot on bumping mill 5th floor. Then toasted in popper.— A few puffs.

(B) After material was flaked it was dried down to 12% moisture. Then puffed in guns.

4 oz. flakes

140 pounds pressure.
About 50% of flakes puffed well.

Weight—6½ oz.—to a 7 oz. Rice Puff sack."

It will be observed that two experiments are covered by that exhibit. In the first experiment the corn was toasted in a popper. Whether it was in a flaked condition does not appear, nor does it appear from the exhibit that the corn was dried to a moisture content "suitable for explosive puffing" as called for by the involved counts. In the second experiment the corn was reduced to a flaked condition ("a semi-thick flake," according to the testimony of appellant Penty), whereas each of the counts in issue contain the limitation that the internal structure of the grain is altered by mechanical pressure without being reduced to a flaked condition.

Appellants' exhibit No. 2 is dated June 19, 1936, and, so far as pertinent, reads:

"White Corn Puffs
(no flavor)

Cooked 100 pounds No. 4 grits with 1½ gallon of water for 1½ hours at 18 pounds pressure. Removed steam and separated in grinder. Then flaked on bumping mill. Tried puffing. Just fair.

Part of corn was just bumped slightly. Then dried to 12% *and tried shooting in gun.*

4 oz. corn

150# pressure.

*Not very good."* (Italics ours.)

It will be observed that that exhibit also refers to two experiments. In the first, the corn was flaked on a bumping mill. Accordingly, for the reasons stated relative to appellants' exhibit No. 1, that experiment does not conform to the process defined in the counts. In the second experiment referred to in exhibit No. 2, the corn, it is stated, was "bumped slightly," then "dried to 12% and tried shooting in gun" and that the results were "Not very good."

It clearly appears from the record that in the art here involved the term "bumped" means altering the internal structure of the grain by mechanical pressure, without reducing it to a flaked condition.

Appellants' exhibit No. 6 is dated June 19, 1936, and, so far as pertinent, reads:

"White Corn Puffs.
2% salt.
100 pounds #4 grits
1½ gallons water
2% salt

Cook for 1½ hours at 18 pounds pressure —Removed steam, separated, and bumped slightly tempered 18 hours then shot in gun.                                    4 oz. corn
                                                    140# pressure.

"Fairly good."

Appellant Penty testified that the most successful of the experiments hereinbefore referred to was that described in appellants' exhibit No. 2; that that particular experiment is the basis of appellants' involved application; and that by the notation "Not very good," appearing on exhibit No. 2, it was meant that only about 50 per cent of the grain used in the test was puffed, the other 50 per cent being charred and remaining in the gun.

Appellants' witness Rochester stated that only about 30 to 40 per cent of the corn referred to in exhibit No. 2 was in a "marketable condition," the remainder being "charred and burned and stuck in the gun."

Appellants' witnesses testified that the gun used in those experiments was a small homemade affair with which they had considerable trouble; that it leaked when a high pressure was developed; and that many experiments were performed in which salt was used to prevent the material from charring and sticking to the gun.

Appellant Penty testified that *the processes for puffing corn, referred to in appellants' exhibits Nos. 1, 2, and 6, were suggested to him by appellant McKay.*

It further appears from the record that a larger gun, ordered by the Kellogg Company, was apparently delivered sometime during October, 1936.

On October 28, 1936, according to the testimony of appellant Penty, corn, which had been "medium flaked," was tried out in the new gun by Kellogg, Jr., and the witnesses Swartz and Rochester. The experiment was unsuccessful owing to the fact that the corn "would stick in the gun and char and come out in lumps." Appellant Penty stated that he explained to Kellogg, Jr., that the charring and sticking of the corn was due to the fact that the flakes were quite thin, and that that evening he

and Kellogg, Jr., discussed the matter of the cooking of corn the following day—October 29. On October 29, 1936, corn was cooked, bumped, then "dried down" to about 12 per cent moisture, and allowed to temper until the next day—October 30. Then, according to Penty's testimony— "* * * Late in the morning of Oct. 30th Mr. Swartz and Mr. John L. Kellogg, Jr., took this bumped material to the gun room and first started shooting raw wheat in the gun to heat the gun up, which was necessary for good work. I went to lunch about 12 o'clock, and when I returned there was a carton of puffed material setting on the table. Mr. John L. Kellogg, Jr., and Mr. Swartz had gone to lunch. I examined the material in the carton and it showed a very nice puff from the corn. When John L. Kellogg, Jr., returned from lunch I made the remark to him that it was very nice and I felt we had something really good there. John L. Kellogg, Jr., said 'Let's take it over to Gene,' meaning Mr. Eugene H. McKay [one of the appellants], which we did, and we went into Mr. McKay's office and John showed it to Mr. McKay and Mr. McKay made the remark, 'that looked very good,' and 'when did you get that'. I told him Fred Swartz and John L. Kellogg, Jr., had shot it in the large gun during the noon hour, and Mr. McKay said 'let's take it in and show Mr. W. K. Kellogg'. *On entering Mr. Kellogg's office Mr. McKay said, 'See what John has made'. Mr. Kellogg looked at the product and said it was very nice and said, 'Who gets the credit for making this?' There was nothing said for a few minutes until finally Mr. McKay said that John L. Kellogg, Jr., and Fred Swartz had shot it during the noon hour from the gun, and Mr. W. K. Kellogg smiled and shook hands with John L. Kellogg, Jr., and then John L. Kellogg, Jr., told Mr. W. K. Kellogg that Bill, meaning myself, had done the bumping of the corn. Mr. W. K. Kellogg then shook hands with me.* We left Mr. W. K. Kellogg's office and went back to Mr. McKay's office and I said to him, '*We practically did that same thing with the same formula back in June with the small gun, but on account of the leakage in the gun and not being able to get it up to as high pressure as we wanted, the material was not all good as it would stick together and gum, but if we had had this same gun at that time we would have gotten the same results as we are getting now.*' Mr. McKay remarked that *John was very much taken up with the*

*work in the experimental room and that we would let him take out the patent in his name, and I told Mr. McKay it was all right with me as it was Company property.* I returned to the experimental room and in about half an hour John L. Kellogg, Jr., came in and said he had been talking to Mr. E. H. McKay and he said it would be all right for him to apply for the patent in his name, and *I told John that it was perfectly all right with me inasmuch as the patent belonged to the Company."* (Italics not quoted.)

The corn puffed on October 30, 1936, and shown to McKay and Mr. W. K. Kellogg is in evidence as appellants' exhibit No. 7.

Whether Kellogg, Jr., returned to McKay's office with appellants after leaving Mr. W. K. Kellogg's office, appellant Penty did not state.

It may be stated at this point that, during the year 1935, Kellogg, Jr., was a vice president and one of the directors of the Kellogg Company and received a salary of $10,000 per year; that on or about April 18 of that year he met with an accident; that he experienced some nervous disorder and entered the Milwaukee Sanatarium at Wauwatosa, Wisconsin, on June 28, 1935; that he remained there; although not confined in the institution, until November 2, 1935, at which time, according to the evidence, he left the sanatarium "perfectly well." While in the sanatarium, Kellogg, Jr., contacted a mechanical engineer, Hugo Vehling, for the purpose of having a grain exploder manufactured for making puffed products. The material for such a device was ordered, but the order was canceled by the sanatarium authorities because they desired that the patient have complete rest while in the institution. After leaving the sanatarium, Kellogg, Jr., spent a few months on a ranch and late in 1935 or the early part of 1936 returned to active duty in the sales department in the Chicago district of the Kellogg Company. On October 15, 1936, he returned to the Kellogg Company's plant at Battle Creek, Michigan, and, at his request, was placed in the experimental department. On or about December 19, 1936, he left the company's employ.

Appellant Penty further testified that after he had been informed by Kellogg, Jr., that Mr. McKay had said that Kellogg, Jr., could take out a patent covering the puffed corn product produced on October 30, 1936, or the process of producing it (the witness did not explain which) he, in the presence of Kellogg, Jr., "made out" an invention conception data sheet, introduced in evidence as appellants' exhibit No. 8; that he gave the sheet to Kellogg, Jr., "who in turn was going to take it up to" Mr. H. K. Wilder, "who wrote out the descriptions [of the involved process] preparatory to having it submitted to the attorneys to apply for the patent" which, the witness stated, "was being taken out in J. L. Kellogg, Jr's. name as the inventor."

Appellants' exhibit No. 8 contains, after the word "Inventor," the name "John L. Kellogg, Jr." The exhibit, which is signed by Kellogg, Jr., as the inventor and witnessed by appellant William P. Penty and appellants' witnesses Frederic W. Swartz and Lynn Rochester, also contains the following: the date of conception, October 28, 1936; the date of the first disclosure to others, October 28, 1936; the names of the persons to whom disclosure was made, "Wm. P. Penty, Fred Swartz"; the date of the first written description, October 28, 1936; the date of the first model, October 29, 1936; the date of the making of the first full-size device, October 30, 1936; the *"Date and place invention was first successfully practiced October 30—1936 Experimental Room 1st floor No. 2 Bldg Kellogg Company"*; and the "Names of persons having knowledge of such practice John L. Kellogg, Jr., Fred Swartz, Lynn Rochester, Wm. P. Penty."* (Italics not quoted.)

It will be observed that appellants' exhibit No. 8, *prepared by appellant Penty,* contains the statement that the process performed on October 30, 1936, "was first successfully practiced" on that date.

Under date of October 30, 1936, H. K. Wilder, hereinbefore referred to, signed the following statement (identified in the record as appellee's exhibit No. 26):

"Corn Krispies

"The following is a description by Mr. John L. Kellogg Jr. on the method of making an experimental lot of Corn Krispies.
    Took 100 lbs regular flaking corn grits.
      4 gallons water.
    Cooked for one hour in rotary cooker at 20 lbs. steam pressure.
    Dried partially to permit bumping very slightly in corn rolls, no differential.

Further dried to hard and brittle condition. Tempered.

1 gallon cooked dried grits ⎫
1 tablespoon salt ⎬
mixed dried and put in puffing gun. ⎭

Puffed after pressure reached 200# gage.

Product is a greatly enlarged swollen and rounded grit. It has a partly browned color, appearing as though moderately toasted. The internal structure is of uniformly expanded webs, not having any definitely hollow interior."

That statement was witnessed by John L. Kellogg, Jr., and (Mrs.) Bessie E. Curtiss, secretary to Mr. Wilder.

Two other invention conception data sheets, introduced in evidence as appellee's exhibits Nos. 24 and 25, were witnessed by appellant Penty and the witnesses Swartz and Rochester. Owing to the fact that appellant Penty and the witnesses Swartz and Rochester all testified that written matter had been added to those exhibits after they had signed the exhibits as witnesses, those exhibits will not be given consideration except so far as they indicate the purpose of appellant Penty and the witnesses Swartz and Rochester to designate Kellogg, Jr., as the inventor of the process carried out on October 30, 1936.

It further appears from the record that in November, 1936, Arthur B. Seibold, a patent attorney, prepared, on behalf of the Kellogg Company, a draft of a patent application for the involved invention, in which Kellogg, Jr., was named as the inventor; that such draft was mailed to Kellogg, Jr., with the request that he made such suggestions as he deemed advisable; that the description of the invention was prepared by H. K. Wilder; that, on December 10, 1936, the witness Seibold wrote a letter to Kellogg, Jr., in care of the Kellogg Company, Battle Creek, Michigan, in which it was stated that a patent application for the involved process, together with an assignment of the invention to the Kellogg Company, was enclosed; and that it was suggested in the letter that Kellogg, Jr., take the matter up with Mr. Wilder, and if the application met with Kellogg, Jr's., approval, he should sign it and also the assignment of the same to the Kellogg Company. (So far as appears from the record, all of the information received by Mr. Seibold in the preparation of that patent application for Kellogg, Jr., was furnished either by Kellogg, Jr., or by Mr. Wilder.)

It further appears from the record that Kellogg, Jr., refused to assign the patent application to the Kellogg Company, and that efforts were made by the witness Walter C. Hasselhorn, a director, vice president, and general manager of the Kellogg Company, to secure Kellogg, Jr's., signature to such assignment. The witness stated that, although Kellogg, Jr., did not claim to be the inventor of the involved process, he, the witness, nevertheless, stated to Kellogg, Jr., that if the puffed corn product produced by the involved process proved to be a commercial success, Kellogg, Jr., would be given a bonus, not, however, "in consideration of any invention assignment." In explanation, the witness stated: "I might say here that members of our Company, who did *extraordinary work are being rewarded from time to time for either individual or joint applications of that type, but he was not satisfied with as indefinite a proposition as that.*" (Italics ours.)

When Mr. Seibold learned that Kellogg, Jr., had refused to assign the patent application to the Kellogg Company, a conference was held, apparently on December 30, 1936, in the office of the Kellogg Company. Present at the conference were Mr. Seibold, Mr. Crichton Clarke (a patent attorney), Ross T. Adams (who at that time was apparently director of purchases and looked after the legal affairs of the Kellogg Company), Mr. Edwin L. Harding (secretary and general counsel of the Kellogg Company), the witnesses Walter C. Hasselhorn, Swartz, and Rochester, and appellants McKay and Penty. (On the sheet of his calendar pad dated that day, appellee's exhibit No. 12, appellant McKay made the following notation: "Arrived 8 15 A. M. W. C. H. came in at same time. Clarke—Harding Seibold here all day talking over John's invention. Clarke and Ross came in at 10—W. C. H. left for the West today. Penty was in W. C. H. office all day with Lawyers left at 6 P. M. for home.") As a result of that conference, it was decided by the attorneys and executives representing the Kellogg Company that an application for a patent for the involved invention should be filed in the names of McKay and Penty as joint inventors. Thereafter, appellants' patent application here involved was prepared and filed in the Patent Office.

It further appears from the record that on or about December 30, 1936, Mr. W. K. Kellogg, who was not called as a witness, called Kellogg, Sr., on the telephone and requested that Kellogg, Sr., prevail upon his son, Kellogg, Jr., to sign the application and the assignment thereof to the Kellogg Company theretofore prepared by the patent attorney Seibold.

On January 15, 1937, one day after the filing of appellants' application, the Kellogg Company's patent attorney Arthur B. Seibold, apparently as a result of the December conference, filed an application for a patent for the involved invention, claiming that he was the first and original inventor of the involved process.

The witness Seibold was originally a party to the involved interference. However, he disclaimed "the invention" and was, accordingly, eliminated from the interference.

On November 25, 1936, Mr. W. K. Kellogg wrote to Kellogg, Jr., from Pomona, California, and, among other things, said:

"All the people here in California who have tried *your new* 'Korn Krispies' seem to like it very much. Wish you would enter an order to have two packages a week sent here until the first of the year.

"Am sending you this remnant of some 'Exploded Corn' made by the Schultz Food Company of Oakland, California which I found on the pantry shelves last night. This is probably made from uncooked corn. The flavor is not especially good and the product is certainly plenty tough." (Italics not quoted.)

In addition to appellee's exhibit No. 12, hereinbefore referred to, appellee offered in evidence other sheets from appellant McKay's calendar pad which were dated October 19 to 29, 1936, inclusive, November 2, 1936, and January 5 and 12, 1937. Those sheets are identified in the record as appellee's exhibits Nos. 46 to 56, inclusive.

On the calendar sheet dated Thursday, October 29, 1936, appellee's exhibit No. 53, appellant McKay wrote: "Arrived office 8 *05* A. M. John here. *Big day for John invented new corn puff best we have ever had. Mr. W. K.* [meaning W. K. Kellogg] *here. He liked the puffs too.* Earl home from east. Left office 5 *20* all others gone." (Italics ours.) On the calendar sheet dated Monday, November 2, 1936, appellee's exhibit No. 54, appellant McKay wrote, among other things: "John

on job with Penty." On the calendar sheet dated Tuesday, January 12, 1937, appellant McKay wrote, among other things: "Clarke [a patent attorney hereinbefore referred to] here today to discuss John & two patents by Penty & McKay—Puffed Corn both by Gun & oven. Penty & I assigned two patents to K. Co. Today—One for oven puff. One for gun puff. Clarke left 5 P. M. with Ross [Adams]."

Although there is some evidence of record that Kellogg, Jr., had in mind some new puffed product for the Kellogg Company, and that he suggested, at least, as early as May 20, 1936, the idea of altering or breaking up the starch cells in grain before puffing it, there is no direct evidence that he had a conception of the involved invention prior to October 28, 1936, when, according to the testimony of appellant Penty, Kellogg, Jr., and Penty discussed the matter of charring and sticking of the corn which was shot in the new gun on that day by Kellogg, Jr., and the witnesses Swartz and Rochester. It will be recalled, however, that the witness Penty testified that the process used in the experiments performed by him and the witnesses Swartz and Rochester on June 19, 1936, was suggested to Penty by McKay. It will also be recalled that appellant Penty testified that it was McKay who suggested that Kellogg, Jr., be named as the inventor of the involved process, and that it was McKay who made the notation on his calendar pad under date of October 29, 1936 (which should have been entered under date of October 30, according to the evidence of record) "Big day for John invented new corn puff best we have ever had" and that Mr. W. K. Kellogg liked the new corn puffs.

There is no evidence that that statement was written by appellant McKay for any purpose other than to record the truth as he understood it at that time.

We are of opinion that appellants' exhibit No. 1 does not disclose the involved invention. However, we think appellants' exhibits Nos. 2 and 6 disclose the process set forth in the counts in issue. It is clear, however, from those exhibits and from the testimony of appellant Penty and the witnesses Swartz and Rochester, hereinbefore referred to, that the process was not successfully carried out by appellants on June 19, 1936. In view of the fact that the process described in exhibits Nos. 2 and 6 *was disclosed to Penty by McKay, who not only admitted but asserted that Kellogg,*

*Jr., was the inventor of the involved process, and as McKay refused to sign appellants' preliminary statement, and as he was not called as a witness by the Kellogg Company,* the assignee of appellants' application, we are unable to hold that appellants were the first to conceive that process.

Appellant Penty prepared and witnessed the invention conception data sheet, appellants' exhibit No. 8, not only for the purpose of acknowledging that Kellogg, Jr., was the inventor of the involved process, but also for the purpose of having a patent issue in Kellogg, Jr's., name. Furthermore, it is clear from the evidence of record that neither of appellants had any thought of claiming that appellants were the inventors of the subject matter defined in the counts in issue until after the conference on December 30, 1936, hereinbefore referred to. It is also clear from the evidence that had Kellogg, Jr., signed the patent application and the assignment thereof to the Kellogg Company, prepared by the attorney of that company, appellants would not have filed their involved application, nor would the witness Seibold have felt called upon to file his application *in which he claimed to be the original inventor of the involved process.*

Under the related circumstances, there is a very strong presumption that Kellogg, Jr., was the original inventor of the involved process, which presumption, in our opinion, has not been overcome by the evidence.

Much of the discussion in the case by counsel for appellants has to do with the statements made by the witness Hasselhorn and appellant Penty that the reason the executives of the Kellogg Company, including appellants McKay and Penty and the witnesses Swartz and Rochester (employees of the company), acknowledged Kellogg, Jr., to be the inventor of the involved process was because it was desired to encourage him and to please Mr. W. K. Kellogg. So far as the testimony of the witness Hasselhorn in that regard is concerned, it is sufficient to say that it is purely hearsay. Furthermore, the testimony of appellant Penty regarding the reasons he said McKay gave for naming Kellogg, Jr., as the inventor of the involved process is not corroborated.

Another strong circumstance which we think supports the conclusion reached by the tribunals of the Patent Office is the

fact that both the witness Hasselhorn and Mr. W. K. Kellogg attempted to secure Kellogg, Jr's., signature to a patent application for the involved invention as well as an assignment of such invention to the Kellogg Company, and that the witness Hasselhorn, according to his own testimony, offered Kellogg, Jr., a bonus, in the event the involved process became commercially successful, if he would sign the patent application and assign it to the Kellogg Company.

It is stated in the brief of counsel for appellants that "The law recognizes that mistakes are made in selecting inventors to file applications and provides for filing an application by the real inventor when the error is discovered," and cases are cited in support of that statement.

The difficulty with that statement of counsel, as applied to the instant case, is that it assumes facts not established by the evidence of record.

The conduct of appellants and that of the witness Hasselhorn (a director, vice president, and general manager of the Kellogg Company) and the witnesses Swartz and Rochester is wholly inconsistent with appellant Penty's present claim that appellants are the inventors of the involved process, and, as the issue here is one of originality, such conduct is entitled to great weight in the determination of that issue. See Murphy v. Meissner, 24 App. D.C. 260; Lloyd v. Antisdel, 1901 C.D. 371, 375; Barrett v. Harter, 1904 C.D. 392; Larkin v. Richardson, 1906 C.D. 209; Ohlsen v. Harmer, 1909 C.D. 220; Engle v. Manchester & Spooner, 49 App.D.C. 191, 262 F. 645; O'Donnell v. Hartt, 75 F.2d 195, 22 C.C.P.A., Patents, 958, 968.

We are not unmindful of the fact that Theresa L. Gibbons, who was secretary to Mr. E. L. Harding (secretary and general counsel of the Kellogg Company), testified that about ten days before Christmas 1936 Kellogg, Jr., told her that he was not the inventor of the involved process but that Penty and McKay were the inventors of it. However, considering all of the facts and circumstances hereinbefore related, we are unable to hold that the tribunals of the Patent Office erred in holding that appellants derived the invention from Kellogg, Jr. Accordingly, the decision of the Board of Appeals is affirmed.

Affirmed.